584 F.2d 1208
 Robert DRAYTON, Appellee,
v.
Cecil McCALL, Individually and in his capacity as Chairman,
United States Parole Commission, Benjamin J. Malcolm, George
J. Reed, Dorothy Parker, Joseph A. Nardoza, J. Robert
Cooper, Robert Vincent, William E. Amos, Audrey A. Kaslow,
Members of the Parole Commission, Individually and in their
capacity as Members of the Parole Commission, Stanley B.
Kruger, Individually and in his capacity as Parole Hearing
Examiner, William L. Quirk, Individually and in his capacity
as Parole Hearing Examiner, and Raymond Nelson, Warden,
Federal Correctional Institution, Danbury, Connecticut, Appellants.
 No. 1089, Docket 78-2030.
 United States Court of Appeals,
Second Circuit.
 Argued June 21, 1978.
Decided Oct. 2, 1978.
 
 Frederick E. Martin, Atty., Dept. of Justice, Washington, D. C. (Benjamin R. Civiletti, Asst. Atty. Gen., George W. Calhoun, Patrick J. Glynn, Attys., Dept. of Justice, Washington, D. C., of counsel), for appellants.
 Robert Kochenthal, Student Law (Judith P. Resnik, New Haven, Conn., supervising), (Dennis E. Curtis, Judith P. Resnik, Mary F. Keller, Stephen Wisner, New Haven, Conn., of counsel), for appellee.
 Before OAKES, VAN GRAAFEILAND and MESKILL, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal presents the questions whether the Due Process clause mandates procedural safeguards before the United States Parole Commission may rescind a prior grant of parole to begin In futuro and, if so, the extent of the safeguards mandated. The United States District Court for the District of Connecticut, T. F. Gilroy Daly, Judge, held that the procedures specified in Morrissey v. Brewer, 408 U.S. 471, 487-90, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and Gagnon v. Scarpelli, 411 U.S. 778, 790-91, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), are similarly required in parole rescission hearings. Drayton v. McCall, 445 F.Supp. 305 (D.Conn.1978) (memorandum of decision). We agree that a federal prisoner whose date of parole has been approved but who has not yet been released from prison (a parole grantee) is entitled to procedural due process in his rescission hearing. However, we do not agree that all of the procedures mandated in parole and probation Revocation hearings must be complied with in parole Rescissions. We therefore modify the order below to provide for appellee's continued release on parole unless within thirty days the United States Parole Commission (Commission) conducts a hearing conforming with the procedural requirements of this opinion.
 
 I. FACTS
 
 2
 The facts of this case are not in dispute. Drayton was incarcerated at the Federal Correctional Institution in Danbury, Connecticut (Danbury), in connection with a conviction for unlawful distribution of narcotics. When he returned from a furlough on October 18, 1977, prison authorities took a routine urine sample and sent it to a laboratory for analysis. Two days later, at a previously scheduled parole hearing, the panel recommended his release on parole, effective February 14, 1978. The following day, October 21, the test results from the urine sample, which revealed the use of amphetamines, were returned to the authorities at Danbury. Prison officials then charged appellee with illicit use of narcotics and notified him of his right to an institutional disciplinary committee (IDC) hearing. This hearing was conducted by prison authorities (not the parole board) on October 28, 1978, purportedly in accordance with the dictates of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The record indicates that a staff member represented appellee before the IDC. The committee found Drayton guilty as charged and ordered the forfeiture of twenty-five days' statutory good time without indicating the evidence relied upon or the reasons for disbelieving Drayton. Its report simply stated: "Reason for action taken: Seriousness of offense."
 
 
 3
 Apparently unaware of the IDC proceedings, the Parole Commission's Northeast Regional Office adopted the panel's recommendation and granted parole effective February 14, 1978. Before Drayton was formally notified in writing of the favorable parole decision, however, the Bureau of Prisons advised the Commission of the prison disciplinary action. On the basis of this new information,[1] the Commission then reopened the case on its own motion pursuant to 28 C.F.R. § 2.28[2] and scheduled a rescission hearing pursuant to Id. § 2.34.[3] Notices of action dated November 8, 1977, informed Drayton of the original parole grant and of the decision to reopen the case.
 
 
 4
 As found by the district court, Drayton v. McCall, supra, 445 F.Supp. at 306-07, the rescission hearing held on December 16, 1977, conformed to the procedures outlined in the Commission's regulations. See note 3 Supra.[4] Drayton's attorney, Ms. Resnik, requested that her client be accorded the due process rights of Morrissey, supra, and Gagnon, supra, in accordance with previous holdings of the District Court for the District of Connecticut. See note 10 Infra. The hearing examiners indicated at the outset that their practice pursuant to governing regulations is to ignore these constitutional rulings, and accordingly denied the request.[5]
 
 
 5
 The only evidence presented against appellee was the IDC's finding of guilt, which under the regulations, 28 C.F.R. § 2.34(a)(2), could be considered conclusive on the question of institutional misconduct. Note 3 Supra. Drayton presented certain documentary evidence and was questioned by the examiners. He maintained that while on furlough with his family, he consumed only vitamin pills, as was the family's custom. He also explained that he and two other inmates gave urine samples at about the same time, under procedures which left open the possibility of confusion among or tampering with the samples. He emphasized that he had no history of amphetamine use, had already been accepted by and received a grant from a community college, and would not have jeopardized his freedom by taking such pills.
 
 
 6
 The examiner who conducted the questioning, Mr. Kruger, responded that the Commission "cannot usually grant release when there is statutory forfeiture of good time on the record and still outstanding,"[6] but he permitted Ms. Resnik to speak. She again asked to be allowed to function fully as an attorney. She requested that the examiner permit Drayton to call witnesses in his behalf and to call and cross-examine possible adverse witnesses such as the officer who took the urine sample, the two other inmates then present, the laboratory technicians, and others. Mr. Kruger responded: "Obviously, . . . we must respectfully decline your request, we are simply not empowered to comply with it." Because Ms. Resnik could not function as an attorney, she merely described the evidence which, if introduced supported Drayton's repeated claims of innocence. She referred to his family's observations of appellee while he was on furlough, appellee's unit manager's willingness to testify that the alleged behavior was uncharacteristic of Drayton, and a pharmacological expert's offer to testify to the inaccuracy of laboratory tests on amphetamine use. Although rushed by the examiners, she also explained how error from mislabeling or tampering either at the institution[7] or at the laboratory could have occurred, and emphasized that only the testimony of those who had contact with the urine sample could resolve that uncertainty.
 
 
 7
 The examiners asked Drayton to "stand outside" for a moment; when he returned, they advised him of their conclusions. The panel first recommended rescission of the parole grant, "based on the findings of the IDC . . . that (appellee) did commit the prohibited act involving drugs . . . ." The panel also recommended that his incarceration be continued until his mandatory release date. That the panel's conclusions were based on its acceptance of the IDC report, without any independent scrutiny of the report or of the factual contentions proffered by appellee, is vividly apparent from its written Hearing Summary, the pertinent portions of which are quoted in the margin,[8] as well as the explicit authorization to treat IDC findings as "conclusive evidence of institutional misconduct." 28 C.F.R. § 2.34(a)(2) (notes 3 & 6 Supra ). The Parole Commission's Regional Office adopted these findings in abbreviated form in its notice of action.[9]
 
 
 8
 Appellee then sought a writ of habeas corpus under 28 U.S.C. § 2241, challenging the constitutional validity of the rescission hearing on due process grounds. Judge Daly, following previous decisions of the District Court of Connecticut,[10] agreed that the procedures accorded Drayton were constitutionally inadequate. It ordered the Commission to provide the full panoply of Morrissey/Gagnon rights in a new rescission hearing by February 8, 1978, warning that "the Court will . . . take such . . . action as it deems appropriate in line with (its prior decisions)"[11] if the Commission failed to comply. In a memorandum decision filed shortly thereafter, Judge Daly elaborated the legal basis underlying his earlier ruling and ordered: "In the event that a proper hearing is not held by (February 14, 1978), the petitioner shall be released on (that date) under the conditions specified in the Commission's original parole grant for that date." Drayton v. McCall, supra, 445 F.Supp. at 311. Because the Commission chose to ignore the court's instructions, on February 9, the district court denied the Government's motions for relief of judgment and a stay of the earlier order pending appeal. It further directed reinstatement of the Commission's October 31 parole grant. Drayton was accordingly released from federal custody on parole on February 14, 1978.
 
 
 9
 We, as well as the parties, interpret the first two orders to be conditional grants of habeas corpus relief which were granted unconditionally upon the Government's noncompliance. Appellant does not dispute the district court's authority to reinstate the original parole decision once the Commission failed to institute a new hearing as required by the conditional writ. See Billiteri v. United States Board of Parole, 541 F.2d 938, 944 (2d Cir. 1976); Grasso v. Norton, 520 F.2d 27, 38 (2d Cir. 1975). Rather, the Commission's position is that the conditional writ was improper; therefore it, as well as the parole release, must be set aside on appeal. See Grasso v. Norton, supra, 520 F.2d at 38.
 
 II. DISCUSSION
 A. Protectable Interest
 
 10
 The Government's assertion that a parole grantee is entitled to no due process procedural protections prior to rescission of his parole grant is untenable. Nevertheless, it maintains that no liberty interest encompassed by the Fourteenth Amendment is involved in this situation because "the government has (not) bound itself by statute, regulation, or well-settled course of practice to take or refrain from taking specified actions on the basis of a prescribed factual determination." Brief for Appellants at 9. In particular, it argues that because the Parole Commission can deny parole and order rescission for a number of reasons, a prisoner has no justifiable expectation in his freedom. Therefore, the argument runs, the rescission of the parole grant did not deprive Drayton of any liberty or property interest constitutionally cognizable under the Due Process Clause. The Commission relies most heavily on Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). These cases held that even if prison authorities transfer an inmate from one state prison to another because of his alleged misconduct, when state law imposes no limitations on the institution's absolute power to transfer the inmate,
 
 
 11
 no Due Process Clause liberty interest of a duly convicted prison inmate is infringed . . ., whether with or without a hearing, absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events.
 
 
 12
 Montanye v. Haymes, supra, 427 U.S. at 242, 96 S.Ct. at 2547 (restating Meachum v. Fano, supra, holding).
 
 
 13
 The Government's position is, however, deficient in two fundamental respects. First, analogizing the federal Commission's limited authority to rescind parole to the unbridled discretion of state prison officials in Montanye and Meachum is unsound. These opinions are clearly premised on the lack of any standards or guidelines imposed by state statute or regulation. See 427 U.S. at 226-27 & n.7, 228, 96 S.Ct. 2532; 427 U.S. at 242, 243, 96 S.Ct. 2543. According to the Commission's own regulations, rescission of a parole grant is, however, permitted basically only under two narrowly circumscribed conditions; even then, the regulations require compliance with a detailed procedural scheme before the Parole Commission may order rescission. First, the Commission may reconsider its grant of parole when the grantee has been found guilty of institutional misconduct.[12] See notes 3 & 6 Supra. Second, reconsideration is authorized when new information adverse to the prisoner and unrelated to prison misconduct is discovered, 28 C.F.R. § 2.34(b), such as a prison's willful concealment or misrepresentation of information. Id. § 2.30 (also applicable to parole revocation). But under § 2.34(b), both the Regional Commissioner and the National Commission must make certain findings before a rescission hearing may be held. See also id. § 2.17(a).
 
 
 14
 Because the Commission, by these regulations, has limited to carefully defined situations its own authority to rescind a parole grant, there is no resemblance to cases such as Montanye, supra, Meachum, supra and others[13] where the Government was in essence not bound by any criteria in engaging in various types of conduct.[14] The regulatory structure, therefore, justifies the parole grantee's expectation of future liberty under the Supreme Court's recent rather formalistic[15] emphasis on governmentally established entitlements.[16] A grantee's entitlement of course, cannot be withdrawn without due process of law.
 
 
 15
 The second flaw in the Government's argument is its apparent disregard of our previously decided cases. The Commission concedes, as it must, that a parole grantee has at least as strong an interest in his seemingly imminent freedom as does a prisoner awaiting an initial parole grant determination. It also apparently realizes that the Commission probably has less discretion in the former than in the latter situation.[17] Thus, in order to arrive at the Government's conclusion that due process is not implicated in parole rescissions, we would have to overrule the settled law of this circuit that due process attaches to parole release decisions[18] and to removal from temporary release programs.[19] To be sure, the Supreme Court may overturn that settled law,[20] but we, of course, are bound by it.
 
 
 16
 We have previously explained why Meachum and Montanye do not undermine our original holding in United States ex rel. Johnson v. Chairman of New York State Board of Parole, 500 F.2d 925 (2d Cir.), Vacated and remanded as moot sub nom. Regan v. Johnson, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974), that an inmate's interest in prospective parole release decisions is the basis for certain due process protections. See, e. g., cases cited in notes 18-19 Supra. The Government suggests that Moody v. Daggett, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), requires reconsideration of the issue. There, a parolee imprisoned for a federal crime committed while on parole from a federal conviction unsuccessfully sought an immediate parole revocation hearing after a parole violator warrant and detainer were issued. His apparent purpose was to serve any sentence imposed for the parole violation concurrently with his new imprisonment. The Supreme Court held that a hearing was not constitutionally compelled until the prisoner was taken into custody for having violated parole because the mere issuance of the parole violator warrant had not deprived him of any protected liberty interest. Id. at 89, 97 S.Ct. 274. In the course of rejecting the prisoner's argument that he had been deprived of a liberty interest, the Court reiterated and applied the familiar principle of Meachum and Montanye that if the Government's authority to withdraw a benefit is not conditioned on the occurrence of prescribed events, the benefit is not a constitutionally cognizable property or liberty interest. It noted:
 
 
 17
 Petitioner also argues that the pending warrant and detainer adversely affect his prison classification and qualification for institutional programs. We have rejected the notion that every state action carrying adverse consequences for prison inmates automatically activates a due process right. In Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), for example, no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a "grievous loss" upon the inmate. The same is true of prisoner classification and eligibility for rehabilitative programs in the federal system. Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U.S.C. § 4081, and petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process.
 
 
 18
 429 U.S. at 88 n.9, 97 S.Ct. at 279. The Government contends that the Parole Commission's discretion is no narrower than that of prison officials; thus under Moody, due process should not apply to its parole decisions. It is unnecessary, however, to draw such a comparison[21] because the Court does not specifically address parole decisions. Its limited reference to the "rights" of prisoners who must Remain institutionalized was no accident. Elsewhere, the Court addressed the effect of the parole violator warrant on the prisoner's chance for parole from the second conviction, "(a)ssuming for the moment that granting of parole is a protected liberty interest which this warrant impinges." Id. at 88, 97 S.Ct. at 279. And the reason for all of this discussion was the Court's initial holding that the second conviction, not the issuance of the warrant, was the cause of his loss of liberty. By contrast, the loss of Drayton's potential liberty, already conditionally granted, was triggered by the Commission's own initiation of rescission proceedings. See United States ex rel. Sims v. Sielaff, 563 F.2d 821, 826, 827 (7th Cir. 1977) (partially distinguishing Moody on similar grounds). We do not read Moody, therefore, as in any way affecting our prior decisions which subject the parole release process to procedural scrutiny under the Due Process Clause. See, e. g., Shelton v. Taylor, 550 F.2d 98, 102 (2d Cir.), Cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).
 
 B. Degree of Protection
 
 19
 The more difficult inquiry is to determine what procedures satisfy due process. The court below followed previous decisions of the District of Connecticut, See note 10 Supra, which had ordered the Commission to provide the Morrissey v. Brewer, supra, and Gagnon v. Scarpelli, supra, safeguards.[22] The Government, of course, argues that at most the procedures specified in Wolff v. McDonnell, supra,[23] suffice.
 
 
 20
 It is a truism by now that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, supra, 408 U.S. at 481, 92 S.Ct. at 2600. Thus, an independent analysis is needed in order to strike a proper balance between the interests of both the prisoner and the Government. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); Morrissey v. Brewer, supra, 408 U.S. at 481, 92 S.Ct. 2593; Zurak v. Regan, 550 F.2d 86, 93-96 (2d Cir.), Cert. denied, 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).
 
 
 21
 The teaching of Wolff, supra, is that more formality in parole revocation proceedings is required than in prison disciplinary proceedings. This is partly because although a parolee is physically free, a prisoner is incarcerated; the forfeiture of good time does not immediately deprive a prisoner of his freedom. Accordingly, his liberty interest is not given as much weight as in contexts where liberty is immediately abridged:
 
 
 22
 Simply put, revocation proceedings determine whether the parolee will be free or in prison, a matter of obvious great moment to him. For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole will be affected; and if parole occurs, the extension of the maximum term resulting from loss of good time may affect only the termination of parole, and it may not even do that.
 
 
 23
 418 U.S. at 560-61, 94 S.Ct. at 2977.
 
 
 24
 Additionally, the need to ensure that intra-prison tension, frustration, resentment, and retaliation are minimized justifies providing fewer procedural safeguards in the prison disciplinary setting. Id. at 556, 561-63, 94 S.Ct. 2963. In recognition of this substantial interest in preventing a disruptive prison environment, we recently held that Wolff procedures sufficiently accommodate an inmate's interest in accurate factual assessment prior to his removal from New York's temporary release program. Tracy v. Salamack, 572 F.2d 393, 397 & n.15 (2d Cir. 1978) (per curiam). Here we deal with an incarcerated prisoner who has already been granted parole subject to a future release date. Because the threat of prison disruption from adversary proceedings is no greater and no less than in prison disciplinary proceedings, the process detailed by Wolff is obviously a major point of reference for us, and the imposition of full Morrissey requirements is not proper. Thus we must reverse.
 
 
 25
 But because ultimate freedom itself is directly implicated in our case and is implicated only indirectly and indeed remotely if at all in the prison disciplinary context, Wolff is not the end of our analysis; a parole grantee although not yet free like a parolee has the taste of freedom in his mouth, the smell of freedom in the air, the touch of freedom within his grasp. Thus, parole rescissions fall somewhere between parole revocations and prison disciplinary proceedings, reflecting considerations of Morrissey in addition to those of Wolff. We have no reason constitutionally to pigeonhole rescission hearings under either case alone; as we read Mathews, indeed, we are compelled to do otherwise.
 
 
 26
 Striking an accommodation by taking cognizance of the previous liberty interest of a parole grantee while seeking to ensure against future prison disorder, we take the following path. First, to ensure that any hearing be meaningful, See Mathews v. Eldridge, supra, 424 U.S. at 333, 96 S.Ct. 893, as we have already implied, note 6 Supra, the hearing must be de novo. The Parole Commission is not bound by, it need give no weight to, the prison disciplinary proceedings. A meaningful hearing requires a neutral and detached hearing body, one that is openminded, which allows the parole grantee to prove that the prison discipline was improperly or excessively imposed and that his conduct does not justify the rescission of the parole already granted. As the proposed rule to eliminate 28 C.F.R. § 2.6(b) indicates, note 6 Supra, disciplinary actions may vary from institution to institution and sometimes may not reflect behavior serious enough to warrant parole denial. Moreover, prison authorities may have wrongfully imposed discipline; at least the parole grantee must be allowed to prove this error before an openminded parole board.[24]
 
 
 27
 To continue, due process requires advance written notice of the claimed misconduct and a written statement by the factfinder of the evidence relied on and the reasons for rescinding parole. Both Wolff and Morrissey mandate these standards. See Notes 2-3 Supra. The grantee must also be permitted "to call witnesses and present documentary evidence in his defense[25] when permitting him to do so will not be unduly hazardous to institutional safety."[26] Wolff, supra, 418 U.S. at 566, 94 S.Ct. at 2980. Although we cannot so prescribe, "it would be useful for the (Parole Examining Board) to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." Id. In addition, because of the importance of preparing an adequate defense, disclosure to the grantee of the evidence against him is also called for, unless the hearing examiner explicitly finds that certain disclosures would unduly threaten institutional safety. As recognized in Wolff, confrontation and cross-examination of those persons associated with the prison who furnish evidence against the grantee may present hazards to institutional interests. However, where such persons are willing to reveal their identity by testifying at the hearing, cross-examination, in all likelihood, will not prompt retaliation or other disruptive actions. Thus, in this limited circumstance, the grantee may confront such adverse witnesses.
 
 
 28
 We do not believe that Wolff's refusal to require counsel at disciplinary hearings is justifiable in a rescission hearing. To be sure, "insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast," Wolff, supra, 418 U.S. at 570, 94 S.Ct. at 2981. But correctional goals are not the primary motivating force behind parole rescissions, as they are in the disciplinary context. See id. Moreover, Wolff's expressed concern of delay in providing counsel "at the time and place where hearings are to be held," Id., seems of little consequence here, given the notification and time constraints imposed by 28 C.F.R. § 2.34. Finally, the more substantial interest of the prisoner in total physical freedom as compared to mere periodic liberty from confinement (See Tracy v. Salamack, supra, 572 F.2d at 396-97) suggests that his interest in proving that he is innocent of the charges is greater. Accordingly, due process mandates the use of counsel, as specified in Gagnon v. Scarpelli, supra, as an appropriate safeguard in parole rescission contexts. Finally, in order to ensure proper compliance with due process dictates, a written record of the rescission proceedings is necessary.
 
 
 29
 The procedures and regulations followed in the instant case were fatally deficient. Notwithstanding Drayton's request to have Ms. Resnik function as counsel and his claim that he had not used amphetamines, the examiners refused to allow such representation or permit appellee to call any witnesses in his defense, even though it appears that some of them would not in any way have adversely affected institutional safety. Although the examiners provided a written statement of the evidence relied on and the reason for rescinding parole, the substance of the statement reveals that the examiners made no attempt to determine the facts; the "Hearing Summary," in fact, refused "to look behind," See note 8 Supra, the IDC findings. We therefore reverse the judgment and remand the case for a further conditional grant of parole in the absence of a parole rescission hearing conducted under the rules above prescribed within thirty days after the district court's order thereon.
 
 
 30
 Judgment in accordance with opinion; no costs.
 
 
 
 [1]
 The Commission's notice of action stated:
 "Reasons: On October 28, 1977, the institutional discipline committee forfeited twenty-five days statutory good time for possession . . . or use of . . . narcotics . . . ."
 
 
 [2]
 28 C.F.R. § 2.28 provides in part:
 § 2.28 Reopening of cases.
 Notwithstanding the appeal procedure of § 2.25 and § 2.26, the appropriate Regional Commissioner may, on his own motion, reopen a case at any time upon the receipt of new information of substantial significance and may then take any action authorized under the provisions and procedures of § 2.25. . . .
 
 
 [3]
 28 C.F.R. § 2.34 provides in part:
 (a) When an effective date of parole or mandatory parole has been set by the Commission, release on that date shall be conditioned upon continued good conduct by the prisoner. If a prisoner has been granted parole and has subsequently been charged with institutional misconduct sufficient to become a matter of record, the Regional Commissioner shall be advised promptly of such misconduct. The prisoner shall not be released until the institution has been notified that no change has been made in the Commissioner's order to parole.
 (1) Upon receipt of information that a prisoner has violated the rules of the institution, the Regional Commissioner may retard the parole grant for up to sixty days without a hearing or may retard the parole grant and schedule the case for a rescission hearing. If the prisoner was confined in a Federal prison at the time of the order retarding parole, the rescission hearing shall be scheduled for the next docket of parole hearings at the institution. . . . When the prisoner is given written notice of the Commission action retarding parole, he shall be given notice of the charges of misconduct to be considered at the rescission hearing. The purpose of the rescission hearing shall be to determine whether rescission of the parole grant is warranted. At the rescission hearing the prisoner may be represented by a person of his choice and many present documentary evidence.
 (2) An institution discipline committee hearing conducted by the institution resulting in a finding that the prisoner has violated the rules of his confinement, may be relied upon by Commission as conclusive evidence of institutional misconduct.
 (3) If the parole grant is rescinded, the prisoner shall be furnished a written statement of the findings of misconduct and the evidence relied upon.
 
 
 [4]
 Judge Daly correctly summarized the procedures as follows:
 Under these regulations, the inmate must be given notice of the charges of misconduct to be discussed at the hearing, and, if the parole is rescinded, a written statement of the findings of misconduct and the evidence relied upon by the Commission. He is allowed to present only documentary evidence, and may be represented by a person of his choice. 28 C.F.R. § 2.34(a)(1). The representative's participation, however, is restricted to a short statement at the conclusion of the interview conduct(ed) by the hearing panel and to the provision of further information requested by the panel. 28 C.F.R. § 2.13 (1977). The parole grantee is not allowed to seek the advice of counsel during the hearing. Furthermore, confrontation and cross-examination is not permitted.
 Drayton v. McCall, 445 F.Supp. 305, 307 (D.Conn.1978) (memorandum of decision).
 
 
 [5]
 Pertinent statements include:
 Mr. Kruger: All right, let me advise you, Miss Resnik, that today you are here as a representative in this case. The representative's role is pretty much limited to offering a statement near the end of the interview. I would ask that whatever statement you have to make that you would hold it until that time.
 Mr. Kruger: All right, we understand your position, Miss Resnik, and I will say again, according to the standard operating procedures that we follow, your role here is a representative, and we ask that you hold your comments until a time later in the interview near the end of it, then we will ask for your statement on behalf of Mr. Drayton.
 Representative: I would certainly try to accommodate you but do not concede that I believe that is my appropriate role here.
 Mr. Kruger: Miss Resnik, we have certain ground rules, we understand the issue you have raised
 Representative: Very good
 Mr. Kruger: But, for the moment, it is the United States Parole Commission, not the Parole Commission of the District of Connecticut. Do you understand what I am saying?
 Representative: Certainly.
 Mr. Kruger: All right, I will give you as much time as you need near the end of the interview, to put whatever you want on the record.
 Parole Rescission Hearing Transcript at 2-3 (Dec. 16, 1977).
 
 
 [6]
 Mr. Kruger may have been referring to 28 C.F.R. § 2.6, which provides:
 § 2.6 Withheld and forfeited good time.
 (a) While neither a forfeiture of good time nor a withholding of good time shall bar a prisoner from receiving a parole hearing, § 4206 of Title 18 of the United States Code permits the Commission to parole only those prisoners who have substantially observed the rules of the institution.
 (b) Forfeiture of statutory good time not restored shall be deemed, in itself, to indicate that the prisoner has violated the rules of the institution to a serious degree.
 Assuming that this provision applies to parole rescissions (Cf. Metz v. Norton ) No. B-74-89, -315, -333, -361, at 14-15 (D.Conn., dated Apr. 30, 1976) (treating prior regulation, 28 C.F.R. § 2.29(a) (1974), as applicable only in initial parole grants because (1) a standard of "continued good conduct" in the parole rescission hearing would be meaningless and (2) an irrebuttable presumption that forfeiture of good time always constitutes misconduct warranting rescission would raise a constitutional question), it, like 28 C.F.R. § 2.34(a)(2), See, supra at n.3, violates the parolee's right to have the Parole Commission determine whether the alleged misconduct actually occurred.
 However, the regulation may not actually mean what it says. The Commission has published a proposed rule to eliminate § 2.6(b), 43 Fed.Reg. 22,747 (May 26, 1978), which states:
 This proposal will Clarify that the Commission Does not simply accept a forfeiture of statutory "good time" as precluding the possibility of parole. Instead, the Commission would, under this proposal, make an assessment of the severity of the underlying violation before making a decision not to release a prisoner on the basis of misconduct. The reason for the proposed change is that disciplinary actions may vary from institution to institution, and sometimes may not reflect behavior serious enough to warrant parole denial.
 (Emphasis added.) It also proposes to eliminate similar language in 28 C.F.R. § 2.53(a), which governs mandatory parole. As of July 10, 1978, the rule had not been adopted. What effect these changes could have on "conclusive evidence of institutional misconduct" that is afforded to IDC findings in parole rescission hearings, Id. § 2.34(a)(2), is an issue we need not decide.
 
 
 [7]
 The essence of the complaint was that the urine sample was left unattended in a room adjoining the holding cell. The doors were open, and other inmates thus had the opportunity to make a "switch." Drayton also asserted that the prison laboratory was notorious for producing inaccurate urine test results because of lax procedures in obtaining and processing the samples
 
 
 [8]
 IV. Finding and Evaluation by Examiner Panel: The panel finds As result of the IDC action on 10-28-77 that subject violated rules and regulations of the institution to a serious degree by use of narcotic or drugs or intoxicant not perscribed (Sic ) in that he submitted urine specimen on return from furlough on 10-18-77 which was subsequently found to contain evidence of amphetamines. Despite subject's frequent denials of use of drugs while on the 10-77 furlough The Panel feels it cannot look behind the committee action and the incident report to take up the rescision (Sic ) process in the more formal adversarial manner that the representative desired and claimed was law for this district. The Panel notes that presently 25 days of SGT is forfeited from the subject record and that The Parole Commission will not normally grant parole when such forfeiture remains outstanding on the record. In view of an impending MR date 6 mo. hence the Panel feels as a practical matter subject should be continued to expiration of this term. Drayton was advised that if his administrative remedy process Succeeds in overturning the IDC action that new information to (sic) be considered by the U.S. Parole commission In re-evaluating his case. For the moment based on the information before the Examiner Panel the Panel felt a rescision (Sic ) and continuance to expiration was in order
 V. Recommendation: Rescind Parole Grant Effective Feb. 14, 1978. Reason: On 10-28-77 The institution disciplinary committee forfeited 25 days SGT after finding you had committed the prohibited act of possession, introduction, use of any narcotic, narcotic paraphenalia (Sic ), drugs or intoxicants not perscribed (Sic ) for the individual by the medical staff which followed upon return from furlough on 10-18-77.
 Continued to Expiration: Reason: Your release at this time would depreciate the seriousness of your Rule violation while on furlough and would promote disrespect for the furlough process available to the Bureau of Prisons. There does not appear to be a reasonable probability at this time that you would conform to the conditions of parole because you used amphetamines while on social furlough in 10-18-77 which was your first return to the community in 23 mo.
 (Emphasis added.)
 
 
 [9]
 In an attempt to have the habeas proceedings below invalidated on technical grounds, the Commission notes that Drayton did not exhaust available administrative remedies with the Bureau of Prisons. We do not believe that exhaustion requires appellee to attack the IDC proceedings in order to receive fair procedures at the parole rescission hearing. First, they are unrelated proceedings conducted by agencies with different functions one acts upon institutional misconduct, and the other determines eligibility for parole. Second, even if the Parole Commission complied with Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), procedures in the prison disciplinary context, its obligation to provide additional procedural safeguards beyond those specified in Wolff, see infra at note 23, and in particular to conduct its own de novo factual hearing, precludes as a constitutional matter, its blind acceptance of and action upon IDC findings
 Moreover, we note that the Government's information is inaccurate. Drayton appealed the IDC decision to the warden on November 18, 1977, without success. His next appeal to the Northeast Regional Director of the Bureau of Prisons was evidently more successful. Although we are unable to find documentation in the record, appellee's brief states that the Director ordered the disciplinary report and action expunged if the IDC did not prepare within 10 days an amended report providing adequate documentation of the specific evidence on which it relied. The IDC apparently complied with this order, but it is unclear when this was done and whether the Parole Commission relied on the earlier deficient or the subsequent "adequate" IDC report.
 The Commission also argues that appellee filed no administrative appeal from the Regional Office's actions. But appellee raises a constitutional question, and we doubt the competence of the Commission to determine this issue. Moreover, the reasoning of Green v. Nelson, 442 F.Supp. 1047, 1052 (D.Conn.1977), in rejecting this same contention, currently applies with equal force:
 (T)he continued failure (of) the . . . Commission to adopt constitutionally mandated procedures covering parole rescission hearings, See, e. g., Metz v. Norton, Civ.No.B-74-89 (D.Conn. April 30, 1976); Williams v. United States Board of Parole, 383 F.Supp. 402 (D.Conn.1974), prompts this Court to doubt the likelihood of relief through the Commission's appellate procedures. Cf. Catalano v. United States, 383 F.Supp. 346, 349 (D.Conn.1974). Thus the petitioner need travel no further down administrative avenues. The questions raised in his petition are properly before this Court.
 
 
 [10]
 That court has ruled on at least six occasions, beginning in 1974, that parole rescission hearings must comply with Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). See Green v. Nelson, supra, 442 F.Supp. at 1058-60, and cases cited therein; note 9 Supra. This is apparently the first instance in which the Government has taken an appeal
 
 
 [11]
 The district court cited Metz v. Norton, supra, which limited its order to expungement from all records of each petitioner's parole rescission notation because the petitioner had by that time been released on parole. Id. at 15. Judge Daly also referred to Green v. Nelson, supra, 442 F.Supp. at 1060, in which the district court ordered expungement, the restoration of statutory good time, and the petitioner's release under the conditions specified in the invalidly rescinded original grant of parole
 
 
 [12]
 Once the Commission grants parole, release on the effective date is "conditioned" on the prisoner's "continued good conduct," 28 C.F.R. §§ 2.29(c), 2.34(a), but the Commission may not negate the grant without a hearing. Id. §§ 2.29(c), 2.34(a)(1). The similar regulations controlling revocation of parole for violations of release conditions include Id. §§ 2.52(a)(2), 2.40
 
 
 [13]
 E. g., Moody v. Daggett, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279, 50 L.Ed.2d 236 (1976) (federal prison officials have "full discretion to control (certain) conditions of confinement"); Bishop v. Wood, 426 U.S. 341, 346 & nn. 8-9, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (affirming district court's conclusion that police officer held his position at "will and pleasure" of city); Board of Regents of State College v. Roth, 408 U.S. 564, 567, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (decision to rehire nontenured teacher left to "unfettered discretion" of university)
 
 
 [14]
 The Government cites additional regulations to bolster its argument that the Commission's discretion to rescind parole is nearly unlimited. The district court properly rejected these contentions. Merely because "(a) grant of parole shall not be deemed to be effective until a certificate of parole has been delivered to the prisoner," 28 C.F.R. §§ 2.29(a), does not furnish the Commission with additional discretion. The certificate must be delivered unless the case is reopened or retarded for misconduct, Id. §§ 2.29(c), 2.34(a) (1), an unsatisfactory parole plan, Id. § 2.29(c), or new information. Id. §§ 2.30, 2.34. Similarly, the provisions for further administrative review and reconsideration of parole decisions of all types, See, e. g., id. §§ 2.54, 2.29(c), in no sense expand the specifically defined events which may trigger the initial parole rescission process
 
 
 [15]
 See L. Tribe, American Constitutional Law §§ 10-9 to 10-10, at 514-32 (1978)
 
 
 [16]
 Appellant asks us to adopt "the holdings of the District of Columbia and Fifth Circuits that procedural due process does not apply to the rescission of a parole grant before it has become effective . . . ." We refuse to declare any such rule. Examination of the cases appellant relies upon does not convince us otherwise
 In Sexton v. Wise, 494 F.2d 1176 (5th Cir. 1974), a prisoner in custody under the Youth Correction Act was issued a "certificate of parole" on November 7, 1972, ordering his release on November 16, 1972. When, on November 13 or 14, the parole authorities were informed that the prisoner had violated a prison rule in September of that year, he was told that he would not be released. The court concluded that an "intended parolee" had no right to parole prior to physical release. It continued:
 While a prisoner remains in the custody of prison officials, he continues to be subjected to their supervision and the wide discretion of the Board of Parole. The Regulations are clear that until final physical release occurs, the Board does not relinquish its broad discretionary powers to rescind any future parole. (28 C.F.R. § 2.20).
 The Board never gave up its custody of Sexton and therefore could properly rescind his conditional parole without affording him a full Morrisey (Sic ) hearing. The notice of denial was not tantamount to a revocation of parole invoking full constitutional safeguards. To require a full Morrisey (Sic ) hearing at this stage would be an extravagant remedy infringing on the discretionary powers of the Board of Parole.
 Id. at 1178. At that time § 2.20 provided:
 Release; Discretionary power of Board.
 When an effective date has been set by the Board, release on that date shall be conditioned upon continued good conduct by the prisoner and the completion of a satisfactory plan for his supervision. The Board may, on its own motion, reconsider any case prior to release and may reopen and advance, postpone, Or deny a parole which has been granted. The Board may add to or modify the conditions of parole at any time.
 (Emphasis added.) 28 C.F.R. § 2.29(c), the current regulation, states:
 Release on parole.
 (c) When an effective date of parole has been set by the Commission, release on that date shall be conditioned upon continued good conduct by the prisoner and the completion of a satisfactory plan for parole supervision. The appropriate Regional Commissioner may, on his own motion, reconsider any case prior to release and may reopen and advance or retard a parole date. A parole grant may be retarded for up to one hundred and twenty days without a hearing for development and approval of release plans.
 This latter regulation strikingly lacks both the "discretionary" language and any reference to authority to "deny" parole which has already been granted.
 Koptik v. Chappell, 116 U.S.App.D.C. 122, 321 F.2d 388 (1963), was also based on the earlier regulation. Additionally, it is doubtful whether this holding still stands, in light of the District of Columbia's subsequent pronouncement that federal prisoners who apply for parole are entitled to certain procedural guarantees. Childs v. United States Bd. of Parole, 167 U.S.App.D.C. 268, 275-279, 511 F.2d 1270, 1277-81 (1974). But see Smith v. Saxbe, 183 U.S.App.D.C. 210, 215-216, 562 F.2d 729, 734-35 (1977) (termination of furlough).
 Appellant also points to McIntosh v. Woodward, 514 F.2d 95 (5th Cir. 1975) (per curiam), which upheld the rescission of a parole grant in a one-paragraph statement indicating that Sexton controlled the case and that Wolff v. McDonnell, supra, did not require a contrary result. The opinion is minimally helpful, given its omission of reasoning or analysis.
 
 
 [17]
 Compare, e. g., 28 C.F.R. §§ 2.29(c), 2.30, & 2.34 With id. §§ 2.13(c), 2.18, 2.20(a), (c), & (g)
 
 
 [18]
 E. g., Coralluzzo v. New York State Parole Bd., 566 F.2d 375, 377 (2d Cir. 1977) (New York minimum period of imprisonment hearing is subject to due process constraints because it is ("a) threshold stage of the parole release process"), Cert. dismissed as improvidently granted, 435 U.S. 912, 98 S.Ct. 1461, 55 L.Ed.2d 503 (1978); Williams v. Ward, 556 F.2d 1143, 1157-59 (2d Cir.) (providing historical review of Supreme Court intimations on possible due process protections of a parole applicant and this court's affirmative conclusion), Cert. dismissed, 434 U.S. 944, 98 S.Ct. 469, 54 L.Ed.2d 323 (1977); Zurak v. Regan, 550 F.2d 86 (2d Cir.) (New York must afford due process procedures in evaluating conditional release applications), Cert. denied, 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977); Holup v. Gates, 544 F.2d 82 (2d Cir. 1976) (initial grant of parole subject to certain procedural protections), Cert. denied, 430 U.S. 941, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977); Haymes v. Regan, 525 F.2d 540 (2d Cir. 1975) (same); Cardaropoli v. Norton, 523 F.2d 990, 994-95 (2d Cir. 1975) (special offender designation subject to due process restraints because it hinders inmate's eligibility for participation in rehabilitative programs including parole); United States ex rel. Johnson v. Chairman of New York State Bd. of Parole, 500 F.2d 925, 928 (2d Cir.) ("(w) hether the immediate issue be release or revocation, the stakes are the same: conditional freedom versus incarceration"), Vacated and remanded as moot sub nom. Regan v. Johnson, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974)
 
 
 [19]
 Tracy v. Salamack, 572 F.2d 393 (2d Cir. 1978) (per curiam)
 
 
 [20]
 We note that the Supreme Court has left open the issue whether a prisoner's interest in prospective parole is entitled to due process protection. Moody v. Daggett, 429 U.S. 78, 88 & n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976); Scott v. Kentucky Parole Bd., 429 U.S. 60, 97 S.Ct. 342, 50 L.Ed.2d 218 (1976) (per curiam) (vacating and remanding case for consideration of mootness); See also Williams v. Ward, supra, 556 F.2d at 1155-59
 
 
 [21]
 Judge Leventhal's review of the few provisions governing federal furloughs highlights the specificity of the parole release, rescission, and revocation regulations, which in turn point to the "liberty" interests implicated here. Smith v. Saxbe, supra, 183 U.S.App.D.C. at 215, 562 F.2d at 734. See also Tracy v. Salamack, supra, 572 F.2d at 394-95 & nn. 3, 6, 7 & 9
 
 
 [22]
 Morrissey v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 2595, 33 L.Ed.2d 484 (1972), requires the following procedures in parole revocations:
 (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.
 Gagnon v. Scarpelli, 411 U.S. 778, 790-91, 93 S.Ct. 1756, 1764, 36 L.Ed.2d 656 (1973), in extending the Morrissey due process requirements to probation revocation proceedings, augmented these minimum procedures with the right to counsel in certain situations, to be determined on a case-by-case basis:
 It is neither possible nor prudent to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is necessary to meet the applicable due process requirements. The facts and circumstances in preliminary and final hearings are susceptible of almost infinite variation, and a considerable discretion must be allowed the responsible agency in making the decision. Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present. In passing on a request for the appointment of counsel, the responsible agency should also consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself. In every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record.
 
 
 [23]
 Wolff v. McDonnell, 418 U.S. 539, 563-72, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), adopted requirements (a) and (f) of Morrissey. See Note 22 Supra. 418 U.S. at 563, 94 S.Ct. 2963. In so doing, it may have implicitly required procedure (b). See id. at 564, 94 S.Ct. 2963. An inmate may call witnesses and present documentary evidence in his behalf, however, only "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." Id. at 566, 94 S.Ct. at 2979. Wolff also determined that the right to cross-examine and confront adverse witnesses was not constitutionally compelled. Id. at 567-69, 94 S.Ct. 2963. Additionally, it held that prisoners have no right to retained or appointed counsel in disciplinary proceedings; but if the inmate is illiterate or if the complexity of the issue is such that the inmate will not be able to present an adequate defense, he should be allowed the aid of a fellow inmate or the staff. Id. at 570, 94 S.Ct. 2963. Finally, it noted that the hearing committee must be sufficiently impartial to satisfy due process. Id. at 570-71, 94 S.Ct. 2963
 
 
 [24]
 It may be objected that our holding permits an anomalous result: a prisoner might be found guilty and punished in a prison disciplinary proceeding but found innocent of the same charge in a subsequent parole board hearing. On closer analysis, however, the anomaly disappears. The two proceedings perform very distinct functions. Wolff teaches that a prison disciplinary hearing need not employ extensive procedural due process protections, since an adverse decision only minimally infringes the prisoner's liberty. But a parole board decision seriously impacts upon a prisoner's expectant interest in freedom from institutional confinement and triggers more complete procedural protections. Thus, the informal factfinding procedures permitted when prison discipline is imposed are insufficient when parole is rescinded. Our holding by no means empowers the parole board to exercise general appellate review over prison disciplinary proceedings. The prison disciplinary proceeding is binding and of full force and effect vis-a-vis prison discipline: the de novo examination of the facts goes only to affect the parole board's own determination as to rescission and is made solely for the purpose of ensuring accurate factfinding in that limited context
 Of course if the prison disciplinary authorities were to adopt in substance the procedures necessary to safeguard accuracy in the parole rescission context, then the parole board may properly accord more deference to their decision. Because we address only the constitutional adequacy of the parole board's own procedures, however, we do not and cannot require such safeguards.
 
 
 [25]
 If not implicit from the quoted language, we add that the grantee must be allowed to be heard in person on his own behalf
 
 
 [26]
 While Wolff expresses concerns about undermining correctional goals by an unrestricted right to present evidence, we find this consideration of minimal import in a hearing that is not necessarily directly related to disciplinary action for misconduct